# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### MAY 2000 Session

## STATE OF TENNESSEE v. TONY JAMERSON A/K/A TONY MCNUTT

**Direct Appeal from the Criminal Court for Shelby County**
**No. 98-10234     Joseph B. Dailey, Judge**

---

**No. W1999-00935-CCA-R3-CD - Decided August 28, 2000**

---

The appellant, Tony Jamerson, appeals from his conviction of first degree premeditated murder, for which he is serving a sentence of life without the possibility of parole. He alleges his conviction was based upon insufficient evidence of premeditation, that his confession was obtained in violation of his constitutional rights and improperly admitted as evidence against him, and that he was denied his right to confront a witness against him by the trial court's ruling limiting the scope of cross-examination of a witness. Finding no merit in these contentions, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3; Judgment of the Trial Court is Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JERRY L. SMITH, J., and ROBERT W. WEDEMEYER, J., joined.

Greg Carman and Amy Mayne, Memphis, Tennessee, for the Appellant

Paul G. Summers, Attorney General & Reporter, Kim R. Helper, Assistant Attorney General, William L. Gibbons, District Attorney General, Memphis, Tennessee, Jennifer Nichols, Assistant District Attorney General, Memphis, Tennessee, for the Appellee

### OPINION

Tony Jamerson, also known as Tony McNutt, appeals from his conviction of the first degree premeditated murder of Ernest Goodwin.[1] Jamerson is presently serving a sentence of life without the possibility of parole for the crime. In this direct appeal, Jamerson challenges the sufficiency of the convicting evidence, the admissibility of his confession, and the limitations

---

[1] The victim was a female.

imposed upon his cross-examination of Sergeant James Fitzpatrick. We have reviewed the record, the briefs of the parties and the applicable law. Because we find no reversible error, we affirm.

In the light most favorable to the state, the evidence at trial demonstrated that Tony Jamerson was living as a roomer with the victim, Ernest Goodwin. On the afternoon and evening of January 7, 1998, Jamerson drank beer and smoked crack cocaine. Around 9:00 p.m., Jamerson called his aunt and asked her for $20.00 for his granddaughter's daycare. The aunt told him she did not have cash but would write him a check. Jamerson inquired where he might cash a check, and he never went to the aunt's house to get the check.

Jamerson arrived at the home he shared with the victim at about 10:45 p.m. He talked with the victim and asked her to loan him $20.00. The victim told him she did not have $20.00. Jamerson thought the victim was lying to him. Around 11:00 to 11:30 p.m., Jamerson again called his aunt's house to inquire about a $20.00 loan. This time he spoke with his uncle, who told him he did not have $20.00 in cash. The defendant inquired where he might cash a check at that hour, and his uncle told him he did not know.

Sometime before about midnight, the victim retired to her bedroom. Jamerson went to the kitchen and retrieved a bottle of wine. He then went into the victim's bedroom. The victim was resting on her bed. Jamerson struck her at least five times on the head with the bottle of wine.

After inflicting the blows, Jamerson washed his hands and the bottle of wine. He changed his clothes, putting his soiled clothing and the bottle of wine into a garbage bag. He moved the victim's body to a closet and covered it with sofa pillows. He retrieved the victim's keys and pulled her car to a convenient location. He took a bank containing change from the victim's room and loaded a 30-inch television set, a vacuum cleaner, and a telephone into the car.

Jamerson drove away and disposed of the garbage bag containing his clothing and the murder weapon. He then traded the television, vacuum cleaner and telephone for ten $15.00 rocks of crack cocaine. He used the cocaine. After staying with the victim's car until it ran out of gas, Jamerson eventually wound up at his cousin's house, where he was apprehended in the early evening hours of January 9.

On January 8, the morning following the murder of the victim, she did not show up for work at 5:00 a.m., and her granddaughter was unable to reach her by telephone at 6:00 a.m. The victim's employer and his wife, the victim's granddaughter and the police went to the victim's apartment later in the morning of January 8 and discovered the victim's body in the closet. The victim's granddaughter observed that the victim's identification and other belongings were strewn about the apartment. According to this witness, her grandmother always wore a small pouch around her neck which contained her identification and money.

Jamerson was detained overnight and questioned the following afternoon by two detectives, Sergeants James Fitzpatrick and A. J. Christian. In pre-trial proceedings, Jamerson

challenged the admissibility of the statement he gave the officers, claiming the statement had not been voluntarily given. In part, the defendant claimed he had been promised a reduced charge of second degree murder in exchange for a confession and that the state had reneged on the deal after he gave his statement. The trial court discredited the defendant's evidence and denied the motion to suppress.

At trial, the defendant faced charges of first degree premeditated murder and felony murder in the perpetration of robbery. The jury found the defendant guilty of premeditated murder and did not report a verdict on felony murder. At the sentencing phase, the jury imposed a sentence of life without parole. In imposing the sentence, the jury found the prior violent felony aggravator based upon evidence of the defendant's prior conviction of aggravated robbery. See Tenn. Code Ann. § 39-13-204(i)(2) (Supp. 1999).

Against this factual backdrop, the defendant appeals.

# I

First, Jamerson alleges that there is insufficient proof of premeditation to support a conviction of first degree premeditated murder. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985); Tenn. R. App. P. 13(e). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Dykes, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990).

In determining the sufficiency of the evidence, this court should not reweigh or reevaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Nor may this court substitute its inferences for those drawn by the trier of fact from the evidence. Liakas v. State, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956); Farmer v. State, 574 S.W.2d 49, 51 (Tenn. Crim. App. 1978). On the contrary, this court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. Cabbage, 571 S.W.2d at 835.

Jamerson was convicted of first degree murder, which is defined in pertinent part as "[a] premeditated and intentional killing of another . . . ." Tenn. Code Ann. § 39-13-202(a)(1) (1997). The first degree murder statute defines premeditation as an action done after the exercise of reflection and judgment. "'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly

decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement or passion as to be capable of premeditation." Tenn. Code Ann. § 39-13-202(d) (1997).

In Tennessee, a homicide, once established, is presumed to be second degree murder. See, e.g., State v. West, 844 S.W.2d 144, 147 (Tenn. 1997); State v. Brown, 836 S.W.2d 530, 543 (Tenn. 1992). The state bears the burden of establishing premeditation in order to elevate the crime to first degree murder. See, e.g., West, 844 S.W.2d at 147; Brown, 836 S.W.2d at 543. The existence of premeditation is a question of fact for the jury. See, e.g., State v. Dennis Wade Suttles, No. E1998-00088-SC-DDT-CD, slip op. at 8, — S.W.3d —, — (Tenn. June 26, 2000); State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). The existence of premeditation may be inferred from the circumstances surrounding the crime. See, e.g., State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998), cert. denied, --- U.S. ---, 119 S. Ct. 2025 (1999). Facts which may support a finding of premeditation include "the use of a weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing." Dennis Wade Suttles, slip op. at 8, — S.W.3d at — (citations omitted). Multiple wounds alone may not support a finding of premeditation, but the existence of multiple wounds may be considered in conjunction with other evidence in assessing whether premeditation exists. Brown, 836 S.W.2d at 542.

In the present case, a reasonable jury could view these facts in the light most favorable to the state and conclude that the killing was premeditated. Jamerson was laboring under a drug addiction and had used crack cocaine and alcohol on the day of the crime. He made two telephone calls to relatives in unsuccessful attempts to borrow money. These calls were made around 9:00 p.m. and 11:00 to 11:30 p.m. Around 10:45 p.m., the defendant arrived at the home where he lived as a roomer with the victim and asked her for some money. The victim responded that she had no money, and the defendant thought she was lying. After the victim retired to her bedroom for the evening, the defendant procured a weapon by going into the kitchen and retrieving a bottle of wine. Jamerson went into the victim's bedroom around midnight and repeatedly struck the unarmed victim in the head with the bottle of wine as she lay resting in her bed. He had time during the interval between his request for money from the victim and the crime to premeditate the murder. Although the defendant claims that he was high on crack cocaine when he committed the crime and that he panicked and fled the apartment, the undisputed evidence is that he had the presence of mind to change his clothes, wash the victim's blood off his hands and the bottle of wine with which he struck the fatal blows, move the victim's body to a closet and cover it with pillows, take a bank containing the victim's spare change and several large household items with him when he left the apartment, and dispose of the wine bottle and his clothing in another location. There is also evidence that he went through the money pouch the victim kept on her person, scattering its contents throughout the apartment. By his own admission, he killed the victim around midnight and did not depart the victim's home until an hour to an hour and a half later. Viewed in its totality, this evidence sufficiently supports the jury's finding of a premeditated killing. See generally State v. Nesbit, 978 S.W.2d 872, 898 (Tenn. 1998) (use of deadly weapon on unarmed victim), cert. denied,

119 U.S. 1359, 119 S. Ct. 1359 (1999); Brown, 836 S.W.2d at 542 (repeated shots or blows considered along with other circumstances in assessing the existence of premeditation); State v. Andrew Lee Moats, Jr., No. 03C01-9805-CR-00184, slip op. at 10 (Tenn. Crim. App., Knoxville, Aug. 10, 1999) (defendant had time to premeditate murder where he placed shotgun across his lap, shined vehicle lights on victim for several seconds, drove forward to victim's vehicle and shot victim), perm. app. denied (Tenn. 2000); State v. Anderson, 835 S.W.2d 600, 605 (Tenn. Crim. App. 1992) (attempt to shoot victim again after he had been felled and rendered helpless).

## II

Jamerson's next contention is that the trial court erred in denying his motion to suppress his statement. He claims that the statement, in which he confessed to the killing of Ernest Goodwin, was obtained in violation of his constitutional rights. Therefore, he posits, it was improperly admitted as evidence against him.

At an evidentiary hearing, the state has the burden of demonstrating by a preponderance of the evidence that the defendant's statements were voluntary, knowing and intelligent. State v. Kelly, 603 S.W.2d 726, 728 (Tenn. 1980). A trial court's determination at a suppression hearing is presumptively correct on appeal, State v. Stephenson, 878 S.W.2d 530, 544 (Tenn. 1994), and the findings are binding upon this court unless the evidence contained in the record preponderates against them. State v. Odom, 928 S.W.2d 18, 22 (Tenn. 1996); Stephenson, 878 S.W.2d at 544; State v. Aucoin, 756 S.W.2d 705, 710 (Tenn. Crim. App. 1988).

Under this standard, matters regarding the credibility of witnesses, the weight and value to be afforded the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial court as the trier of fact. Odom, 928 S.W.2d at 23. On appeal, the defendant has the burden of showing that the evidence preponderates against a finding that a confession was, in fact, knowingly and voluntarily given. State v. Buck, 670 S.W.2d 600, 610 (Tenn. 1984). In determining whether a statement is made voluntarily, this court must look to the totality of the circumstances surrounding the confession, and the standard is whether "the behavior of the state's law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined." Kelly, 603 S.W.2d at 728.

In the present case, Jamerson was picked up for questioning on January 9, 1998 around 7:20 p.m. He testified at the suppression hearing that prior to his arrest, he had smoked $50 to $100 worth of crack cocaine and had consumed approximately half of a pint of whiskey and a case of beer. He was detained overnight, and on January 10 at approximately 2:15 p.m., he was interviewed by Sergeants James Fitzpatrick and A. J. Christian. Prior to the interview, the defendant was allowed to use the restroom and was given a hamburger to eat. According to the state's evidence, Jamerson was advised of his rights before the interview commenced. At first, Jamerson claimed he had gone to the victim's home and smelled an odor. Upon investigation, he discovered her body. The interviewing officers challenged the defendant's claim by pointing out contrary evidence, and around 6:15 p.m., Jamerson finally admitted that he had killed the victim with a bottle of wine. After the defendant related what had happened, the investigating officers called a break to

order dinner. Once the food arrived, the defendant composed himself and related the details of the crime. The interview ended around 7:30 p.m. At approximately 8:45 p.m., a typewritten statement was taken. The defendant was again advised of his rights. The defendant signed the statement at 10:49 p.m.

Sergeant Fitzpatrick testified that the defendant was promised nothing in exchange for his statement, nor was he threatened or coerced. Likewise, Fitzpatrick testified first that he did not recall the defendant asking to make a telephone call, and later he testified that the defendant made no such request. Fitzpatrick was acquainted with the defendant, and he did not think the defendant was under the influence of alcohol or drugs. Sergeant Fitzpatrick acknowledged that the officers may have discussed with the defendant the three possible sentences of life, life without parole, and the death penalty for a conviction of first degree murder. Fitzpatrick testified that he did not tell the defendant that he would be at the trial to see that the defendant got the death penalty if the defendant did not make a statement at that time, and Fitzpatrick did not recall Sergeant Christian making such a statement. According to Fitzpatrick, the charge on the arrest ticket was changed from first degree murder to second degree murder after the defendant made his statement. Fitzpatrick claimed he talked to a member of the district attorney's staff, and the change was made because the staff member told him that the state would be unable to make a case for first degree murder based upon the facts as related in the defendant's statement but that a charge of second degree murder was appropriate.

The defendant testified at the suppression hearing and controverted much of the state's evidence. Jamerson said that Officer Fitzpatrick began questioning him around noon or 12:30 p.m. He claimed he was still under the influence of alcohol and drugs that he consumed prior to being picked up the previous evening and that he had not slept. Jamerson testified that he was not advised of his rights prior to making the oral or typewritten statements and that he only saw the written advice of rights form after he had completed the typewritten statement. He claimed that he asked to make a phone call to an attorney, but he was not allowed to use the phone. Jamerson said that Sergeant Fitzpatrick claimed he could guarantee Jamerson a charge of second degree murder with Range I sentencing if he would make a statement. It was only after this alleged promise was made that Jamerson agreed to cooperate by making a statement.

In resolving the conflicting evidence, the trial court explicitly accredited the testimony of Sergeant Fitzpatrick and discredited the defendant's testimony. After making thorough factual findings regarding the credibility issues, the trial court denied Jamerson's motion to suppress. We are bound by the trial court's findings unless the evidence of record preponderates against them. In this case, the evidence supports the findings, and the findings themselves support the court's ruling. As such, we must conclude that the trial court properly ruled that the defendant's statement was admissible.

**III**

Finally, Jamerson claims that his constitutional right to confront witnesses against him was violated when the trial court limited the scope of his cross-examination of Sergeant James Fitzpatrick. He claims that the court should have allowed him to explore an alleged agreement between the interrogating officers and himself under which he would give a full confession in exchange for an amendment of the charge from first degree murder to second degree murder. The defendant claims that he sought to cross-examine Sergeant Fitzpatrick about his testimony that the defendant was not threatened, coerced or pressured to confess in order to challenge "both Fitzpatrick's credibility as well as the validity of [his] confession." We agree that the trial court should have allowed the defendant to explore the circumstances surrounding the confession; however, we conclude that the error was harmless beyond a reasonable doubt.

The Confrontation Clause of the Sixth Amendment guarantees a criminal defendant the right to cross-examine witnesses against him. See, e.g., U.S. Const. amend. VI; Davis v. Alaska, 415 U.S. 308, 94 S. Ct. 1105 (1974). This interest is likewise protected by the Tennessee Constitution. See Tenn. Const. art. I, § 9. The rights of confrontation and cross-examination are essential to a fair trial. See, e.g., Pointer v. Texas, 380 U.S. 400, 85 S. Ct. 1065 (1965).

Additionally, evidence of the circumstances surrounding a confession are admissible to assist the jury in determining whether the defendant made the confession and whether it is truthful.[2] State v. Pursley, 550 S.W.2d 949, 950 (Tenn. 1977) (citing Wynn v. State, 181 Tenn. 325, 329, 181 S.W.2d 332, 333 (1944)); see also Crane v. Kentucky, 476 U.S. 683, 688, 106 S. Ct. 2142, 2145 (1986).

In the present case, the trial court ruled that the defendant could not cross-examine Sergeant Fitzpatrick about the alleged second degree murder deal made in exchange for the defendant's confession. The defendant made an offer of proof in which Sergeant Fitzpatrick acknowledged that he changed the charge on the defendant's arrest ticket from first degree murder to second degree murder. No further evidence was adduced during this proffer.

However, detailed information about the alleged agreement was presented during the pre-trial hearing on the motion to suppress. The defendant engaged in lengthy cross-examination of Sergeant Fitzpatrick during which the officer testified that he changed the arrest ticket after a representative of the district attorney's office advised him that the state would be unable to prove first degree murder based upon the facts of the case. Sergeant Fitzpatrick denied that there had been any agreement to reduce the charge in exchange for the defendant's confession. On the other hand the defendant testified that Sergeant Fitzpatrick said he could guarantee a Range I, unenhanced sentence for a conviction of second degree murder in exchange for a confession. According to Jamerson, Fitzpatrick said he knew the district attorney personally, and Fitzpatrick begged Jamerson

_____

[2]Pursley mandates that the trial court shall determine as a preliminary matter whether the confession was voluntary. Pursley, 550 S.W.2d at 950. If the confession is admitted, then the jury must determine the weight, if any, to be afforded it. Id.

to trust him. Jamerson claimed that it was only after he was comfortable that the deal was in place that he agreed to make an inculpatory statement.

We believe that the existence of a change-in-charge agreement in exchange for a confession is a "circumstance surrounding the confession" that would be admissible under Pursley and Crane to assist the jury in determining whether the defendant made the confession and whether it was truthful. The method by which the defendant sought to put this information before the jury was cross-examination; therefore, the defendant's right of confrontation was implicated. The information the defendant sought to adduce on cross-examination was relevant and admissible to an issue that was within the province of the jury. By limiting cross-examination, the trial court limited Jamerson's opportunity to present a defense. The limitation on cross-examination was error under the Confrontation Clause.

The question which remains is the effect of the error. In State v. Howell, 868 S.W.2d 238, 252-53 (Tenn. 1993), our supreme court recognized that Confrontation Clause violations are subject to harmless error analysis. In assessing the extent of any harm, the proper inquiry for the appellate court is "whether, assuming that the damaging potential of the cross-examination were fully realized, the error was nonetheless harmless beyond a reasonable doubt." Id. at 253.

As indicated by Sergeant Fitzpatrick's testimony at the suppression hearing, if the trial court had allowed examination of him about the alleged second degree murder deal, the officer would have denied that any such agreement existed. At trial, the defendant made no proffer of any affirmative evidence, such as his own testimony, to the contrary.[3] In the absence of any independent, affirmative proof, we fail to see how Sergeant Fitzpatrick's denial of the alleged agreement would have served to prove that such an agreement existed. Thus, we are confident that the error in limiting cross-examination was harmless beyond a reasonable doubt.

**IV**

In conclusion, we find no reversible error and affirm the judgment of the trial court.

_____
James Curwood Witt, Jr., Judge

---

[3] In fact, *voir dire* was conducted of Jamerson regarding waiver of his right to testify. He stated unequivocally that he did not desire to testify because the trial court had ruled that he would be subject to impeachment with his prior conviction of aggravated robbery. He said nothing that would indicate that his decision to testify would have been different had the trial court not limited the cross-examination of Sergeant Fitzpatrick.